## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### WEST PALM BEACH DIVISION

### CASE NO.: _____

SARAH L. ALLENDORF,

              Plaintiff,

v.

HARBOR AMERICA EAST, INC.,
a foreign corporation,
HARBOR AMERICA COASTAL, INC.,
VENSURE EMPLOYER SERVICES, INC.,
a foreign corporation,

              Defendants.

_____/

### COMPLAINT
### AND DEMAND FOR JURY TRIAL

Plaintiff Dr. Sarah L. Allendorf, as and for her Complaint and Demand for Jury Trial against Harbor America East, Inc., Harbor America Costal, Inc., and Vensure Employer Services, Inc., alleges and states as follows:

### General Allegations

### Nature of the Action

1.      The underlying matter concerns the failure of Defendants to properly and timely pay certain compensation due Plaintiff. As more specifically set forth herein, over the course of a year, and despite previous knowledge of critical flaws in their payroll delivery system and processes, Defendants are responsible to Plaintiff for damages, because they misdirected several hundred thousand dollars of compensation due Plaintiff instead to a third party. Defendant Vensure

Employer Services, Inc. is vicariously liable for the breaches, errors, omissions and damages caused by the other Defendants.

### The Parties

2.      Sarah L. Allendorf is an equine veterinarian.   Dr. Allendorf is a Florida resident and citizen of Canada, practicing equine veterinary medicine in Florida. Dr. Allendorf is an independent contractor providing equine veterinary services to clients of Palm Beach Equine Clinic, an equine veterinary hospital and clinic located in Wellington, Florida ("PBEC").

3.      Defendant Harbor America East, Inc.[1] is a Georgia, United States corporation, having its principal place of business at 21977 East Wallis Drive, Porter, Texas 77365. At times relevant hereto, Harbor America assumed the role and responsibility to pay the compensation due employees and independent contractors of PBEC.

4.      Defendant Harbor America Coastal, Inc. is a Georgia, United States corporation, having its principal place of business at 21977 East Wallis Drive, Porter, Texas 77365. At times relevant hereto, Harbor America assumed the role and responsibility to pay the compensation due employees and independent contractors of PBEC.

5.      Defendant Vensure Employer Services, Inc. ("Vensure") is an Arizona, United States corporation, having its principal place of business at 2600 West Geronimo Place, Suite 100, Chandler, Arizona 85224.   In or about 2018, Vensure merged with and acquired a company called "Harbor America Payroll Services" ("HAPS") and HAPS' subsidiaries, including Defendant Harbor America East, Inc.   Pursuant to that merger, Harbor America became a subsidiary of Vensure Employer Services.[2]

---

[1] Collectively Harbor America East, Inc. and Harbor America Costal, Inc. will be identified as "Harbor America" herein.

[2] See: *Harbor America Celebrates 25 Years In Business and Fourth Anniversary with Vensure Employer Services* February 23, 2022.   **Exhibit 2** hereto.   Found at:

## Jurisdiction and Venue

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship of the parties and the amount in controversy is in excess of $75,000.00.   Jurisdiction is also appropriate because Defendants committed acts and omissions having an effect in Florida upon a Florida resident.

7.      At times relevant hereto, Defendant breached a contract benefitting Plaintiff in Palm Beach County, Florida, and committed acts and omissions regarding the provision of services by Defendant in Palm Beach County, Florida, which damaged Plaintiff in Palm Beach County, Florida.

8.      Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) in that all of the breaches, acts and omissions that give rise to the claims in this action occurred in this District and further have an effect herein.

## Factual Background

9.      At all times relevant hereto, Vensure, through the Harbor America Defendants, provided certain payroll and co-employer services to PBEC pursuant to an agreement (the "Agreement") to pay employees and independent contractors employed by PBEC.

10.     Vensure and its Harbor America subsidiaries publicly hold out to the public that "Harbor America provides integrated services to effectively manage critical human resource responsibilities and employer risks for their clients. Harbor America delivers these services *by establishing and maintaining a co-employer relationship* with the employees at the client's work

---

https://www.businesswire.com/news/home/20220223006312/en/Harbor-America-Celebrates-25-Years-In-Business-and-Fourth-Anniversary-with-Vensure-Employer-Services.

(last visited January 24, 2023).

site and ***by contractually assuming certain employer rights, responsibilities, and risk***." [3] [emphasis added].   At all times relevant hereto, Vensure had knowledge that Harbor America was acting as its agent with respect to Harbor America's obligations to, and rights of Plaintiff.

11.     Under the Agreement, Vensure and Harbor America assumed the responsibilities and risks of PBEC, and through that Agreement, Vensure and Harbor America paid both employees and independent contractors of PBEC at all times relevant hereto.

12.     The Agreement was provided to PBEC in 2020 by David Rhodes, on behalf of Harbor America and Vensure, and executed by PBEC and returned to Mr. Rhodes on or after October 28, 2020.  See document attached hereto as **<u>Exhibit 1</u>, page 5.**

13.     Pursuant to the Agreement, Harbor America covenanted to accurately pay the veterinary hospital personnel of PBEC, and further covenanted to accurately process and directly deposit payroll payments to PBEC personnel.   See, e.g.: **<u>Exhibit 1</u>** at Sections 1.0, 3.2 and **<u>Exhibit 3</u>.**

14.     Under the Agreement, there was a clear and manifest intent of the contracting parties, Harbor America and PBEC, that the Agreement, was to directly benefit those personnel such as Dr. Allendorf, who were employed by PBEC to provide veterinary services, and who were to receive from Harbor America direct deposits of their compensation. Harbor America further assumed the role and obligations of PBEC to Plaintiff, and as well by contractually assumed the

---

[3] See: Harbor America website <u>harboramerica.com</u>, at page <u>https://hapeo.com/about/faq</u> (**<u>Exhibit 3</u>** hereto): ("A PEO provides integrated services to effectively manage critical human resource responsibilities and employer risks for clients. A PEO delivers these services by ***establishing and maintaining a co-employer relationship*** with the employees at the client's work site and by ***contractually assuming certain employer rights, responsibilities and risk.*** A PEO provides relief from the burden of employment administration.") [emphasis added];

and See: Harbor America <u>Linked In</u> page (**<u>Exhibit 4</u>** hereto) found at: <u>https://www.linkedin.com/company/harbor-america/</u>
(same quotation as businesswire.com above).

All websites and pages last visited January 24, 2023.

responsibilities and risk of PBEC to Plaintiff. See, e.g.: **Exhibit 1** at Sections 1.0, 3.2 and Schedule A thereto, and **Exhibit 3.**

15.     The primary purpose of the Agreement was thus to benefit and satisfy the payroll payees of PBEC.   See, e.g.: **Exhibit 1** at Sections 1.0, 3.2 and Schedule A thereto, and **Exhibit 3.**     In that role, Vensure utilized its subsidiaries Harbor America East, Inc. and Harbor America Coastal, Inc.

16.     The Agreement thus existed for the benefit and primary purpose of paying Plaintiff and other personnel of PBEC veterinary hospital. See **Schedule A to** **Exhibit 1.**

17.     Dr. Allendorf was thus an intended third party beneficiary of the Agreement.

18.     Beginning in February, 2022, Harbor America began misdirecting certain compensation payments due to be paid by Vensure and Harbor America to Dr. Allendorf (the "Misdirected Payments").

19.     Instead of being paid to a bank account in the name of Sarah Allendorf, the Misdirected Payments were instead paid by Harbor America into a PBEC employee's bank account.

20.     The account into which Harbor America deposited Dr. Allendorf's Misdirected Payments did not bear the name of Sarah Allendorf.

21.     Harbor America thus materially breached its contract with PBEC by making the Misdirected Payments to someone other than Dr. Allendorf.

22.     Harbor America further materially breached the Agreement by failing to have in place proper safeguards in place to such as dialogue boxes confirming changes to account affiliation, anomaly identification to identify such anomalies such as two payees being paid into the same numbered bank account without cross-reference to the name on the bank account, failing to issue an exceptions report or similar type report when changes to bank account data occurs; and by

failing to accurately report to which bank account Harbor America had paid Dr. Allendorf's compensation.

23.     This was not the first time Harbor America has made payroll misdirection errors with respect to their Agreement with PBEC (the "Prior Misdirected Payments").

24.     Previously, in making the Prior Misdirected Payments, Harbor America had confused three PBEC personnel with the same first name, and in a fourth case, had remitted another Doctor's compensation to an entirely different employee of PBEC.

25.     Harbor America was advised of those Prior Misdirected Payments, admitted the errors, yet failed to take corrective actions and put in place proper safeguards to prevent subsequent errors, such as the Misdirected Payments of Dr. Allendorf's compensation.

26.     Having been notified, and admitting responsibility for the aforesaid Prior Misdirected Payments, Harbor America further materially breached the Agreement by failing to undertake proper and effective corrective action, and by failing to institute the proper safeguards to prevent the subsequent Misdirected Payments of Plaintiff's compensation.

27.     Dr. Allendorf was initially damaged by the Harbor America material breaches of the Agreement in the amount of at least $ 416,291.05.

28.     However, and while some of those funds have been recovered from a third party, at least $214,291.05 of the Misdirected Payments have not been recovered and remain outstanding from Harbor America to Dr. Allendorf.

29.     Dr. Allendorf has made a demand to PBEC for the $ 214,291.05, and PBEC has in turn made demand to Harbor America that Harbor America pay Dr. Allendorf that amount.

30.     Such demand has been made to Harbor America for payment to Dr Allendorf of the remainder of the Misdirected Payments, but Harbor America has refused to remit the funds.

31.     Under Section 5.2 of the Agreement, because of the aforesaid material breaches of the Agreement by Harbor America, Harbor America is contractually obligated to satisfy Dr. Allendorf's demand for payment to her of the amount of the remaining Misdirected Payments, to wit:

**5.2    ASO PROVIDER.**
ASO Provider hereby agrees to indemnify and hold Client harmless from any and all claims, demands, damages (including liquidated, punitive and compensatory), injuries, deaths, actions and causes of actions, costs and expenses (including attorney's fees and expenses at all levels of proceedings), losses and liabilities arising from ASO Provider's material breach of this Agreement.

32.     The Agreement thus is further for the benefit of Plaintiff because Harbor America specifically agreed to make claimants such as Plaintiff whole for any claims arising from a material breach of the Agreement by Harbor America.

33.     Harbor America thus has additionally materially breached the Agreement by refusing to pay Plaintiff the remaining balance of $ 214,291.05 of the Misdirected Payments.

34.     Additionally, Harbor America is required to pay the prevailing party in this action to enforce the provisions of the Agreement:

**7.4    ATTORNEY FEES.**
In the event of any proceeding to enforce the provisions of this Agreement, the prevailing party shall be entitled to an award of its costs and reasonable attorney's fees incurred at all levels of proceedings.

35.     Dr. Allendorf has retained within counsel and is obligated to pay counsel reasonable attorney's fees and costs with respect to this action to enforce the Agreement.

36.     All conditions precedent to this action have either been waived, excused or performed.

## Count I

## Breach of Written Contract

37.     Plaintiff repeats and realleges the General Allegations against Harbor America and Vensure.

38.     At all times relevant hereto and now, the Agreement existed between PBEC and Harbor America.

39.     Under the Agreement, there was a clear and manifest intent of the contracting parties that the Agreement was to directly benefit those personnel such as Dr. Allendorf, who were to receive from Harbor America direct deposits of their compensation.

40.     Further, pursuant to the Agreement, Harbor America assumed the role and responsibilities of PBEC to timely and accurately pay PBEC personnel, and to indemnify PBEC from any claimants such as Plaintiff, for breach of the Agreement. See **Exhibit 1** at Sections 1.0, 3.2, 5.2.

41.     Thus, pursuant to the Agreement, Harbor America covenanted to accurately pay the veterinary hospital personnel of PBEC, and covenanted to accurately process and directly deposit payroll payments to PBEC personnel.   See **Exhibit 1** at Sections 1.0, 3.2, 5.2.

42.     The primary purpose of the Agreement was thus to benefit and satisfy the payroll payees of PBEC such as Plaintiff.   See, e.g.: **Exhibit 1** at Sections 1.0, 3.2 and Schedule A thereto.

43.     Dr. Allendorf was thus an intended third party beneficiary of the Agreement.

44.     Harbor America materially breached the Agreement by making the aforesaid Misdirected Payments to someone other than Dr. Allendorf and then refusing to pay Dr. Allendorf the balance of the Misdirected Payments upon demand.

45.     Harbor America also materially breached the Agreement by failing to have in place proper safeguards within their software in place, such as dialogue boxes confirming changes to payee account affiliation, anomaly identification to identify such anomalies such as two payees being paid into the same numbered bank account without cross-reference to the name on the bank

account, and failure to issue an exceptions report or similar type report when changes to bank account data occurs; and by failing to accurately report to PBEC as to which bank account Harbor America had paid Dr. Allendorf's compensation.

46.     Having been notified, and admitting, the aforesaid Prior Misdirected Payments by Harbor America, Harbor America additionally materially breached the Agreement by failing to undertake proper and effective corrective action, and by failing to institute the proper safeguards to prevent the Misdirected Payments.

47.     Further, Harbor America materially breached the Agreement by erroneously reporting, from February 2022 through early December 2022, that Dr. Allendorf had been correctly paid her compensation, when in fact that statement was inaccurate.

48.     Dr. Allendorf is presently damaged by the Harbor America material breaches of the Agreement in the amount of at least $ 214,291.05.

49.     Because of the aforesaid material breaches of the Agreement by Harbor America, Harbor America is contractually obligated under Section 5.2 of the Agreement to indemnify PBEC from damages by claimants such as Dr. Allendorf.

50.     Harbor America thus has additionally materially breached the Agreement by refusing to pay either PBEC or Plaintiff the Misdirected Payments.

51.     Harbor America is further required under Section 7.4 of the Agreement to pay the prevailing party in this action to enforce the provisions of the Agreement.

52.     Dr. Allendorf has retained within counsel and is obligated to pay counsel reasonable attorney's fees and costs with respect to this action to enforce the Agreement.

       WHEREFORE Plaintiff Dr. Sarah L. Allendorf demands judgment jointly and severally against Defendants Harbor America East, Inc., Harbor America Coastal, Inc., and Vensure

Employer Services, Inc. for actual, consequential and incidental damages, post-judgment interest, and for attorney's fees and costs.

**Count II**

**Breach of Oral Contract**

53.     This count is brought in the alternative, should Defendants deny the existence of a relevant written contract (the Agreement), and is alternatively based upon an oral contract formed between Harbor America and PBEC, which was for the benefit of Plaintiff and other personnel of PBEC, which was breached by Defendants, and for which Plaintiff does not have an adequate remedy at law.   Plaintiff repeats and realleges the General Allegations against Harbor America and Vensure.

54.     At all times relevant hereto and now, an oral contract existed between PBEC and Harbor America, for which Vensure is vicariously liable.

55.     Under the oral contract, there was a clear and manifest intent of the contracting parties that the Agreement, was to directly benefit those personnel such as Dr. Allendorf, who were to receive from Harbor America direct deposits of their compensation.

56.     Pursuant to the Agreement, Harbor America agreed to accurately pay the veterinary hospital personnel of PBEC, and further agreed to accurately process and directly deposit payroll payments to PBEC personnel.

57.     The primary purpose of the oral contract was thus to benefit and satisfy the payroll payees of PBEC.

58.     Dr. Allendorf was an intended third party beneficiary of the oral contract.

59.     For at several years prior to and including the dates of the Misdirected Payments, Harbor America assumed the role of payroll provider for PBEC, made compensation payments due to Dr.

Allendorf and other personnel of PBEC.   The conduct of the parties thus ratified the existence and terms of the oral contract

60.     Harbor America materially breached the oral contract by making the aforesaid Misdirected Payments to someone other than Dr. Allendorf and then refusing to pay Dr. Allendorf the balance of the Misdirected Payments upon demand.

61.     Harbor America also materially breached the oral contract by failing to have in place proper safeguards within their software in place, such as dialogue boxes confirming changes to payee account affiliation, anomaly identification to identify such anomalies such as two payees being paid into the same numbered bank account without cross-reference to the name on the bank account, and failure to issue an exceptions report or similar type report when changes to bank account data occurs; and by failing to accurately report to PBEC as to which bank account Harbor America had paid Dr. Allendorf's compensation.

62.     Having been notified, and admitting, the aforesaid Prior Misdirected Payments by Harbor America, Harbor America additionally materially breached the oral contract by failing to undertake proper and effective corrective action, and by failing to institute the proper safeguards to prevent the Misdirected Payments.

63.     Further, Harbor America materially breached the oral contract by erroneously reporting from February 2022 through early December 2022 that Dr. Allendorf had been correctly paid her compensation, when in fact that statement was inaccurate.

64.     Dr. Allendorf is presently damaged by the Harbor America material breaches of the oral contract in the amount of at least $ 214,291.05.

WHEREFORE Plaintiff Dr. Sarah L. Allendorf demands judgment jointly and severally against Defendants Harbor America East, Inc., Harbor America Coastal, Inc., and Vensure

Employer Services, Inc. and for actual, consequential and incidental damages, post-judgment interest.

## Count III

## Quantum Meruit

65.     This count is brought in the alternative, for which Plaintiff does not have an adequate remedy at law.   Plaintiff repeats and realleges the General Allegations against Harbor America and Vensure.

66.     In 2022, Dr. Allendorf provided services to and on behalf of PBEC which entitled Dr. Allendorf to payment at least in the amount of $ 416,291.05.

67.     PBEC acquiesced in the provision of services by Plaintiff, was aware that the Plaintiff expected to be compensated for such services, and because Plaintiff has not been fully paid for such services, has been unjustly enriched.

68.     By virtue of the Misdirected Payments, Dr. Allendorf, after credit for the recovered partial funds, Plaintiff has been damaged by the Harbor America material breaches of the Agreement in the amount of at least $ 214,291.05, which amount of the Misdirected Payments have not been recovered and remain outstanding to Dr. Allendorf.

69.     Under Section 5.2 of the Agreement, because of the aforesaid material breach of the Agreement by Harbor America by making the Misdirected Payments, Harbor America is contractually obligated to satisfy Dr. Allendorf's demand for payment to Dr. Allendorf of the amount of the remaining Misdirected Payments.

WHEREFORE Plaintiff Dr. Sarah L. Allendorf demands judgment jointly and severally against Defendants Harbor America East, Inc., Harbor America Coastal, Inc., and Vensure

Employer Services, Inc. for actual damages, post-judgment interest, and for attorney's fees and costs.

## Count IV

## Negligence

70.     This count is brought in the alternative, based on torts committed by Defendants which are independent to contract, for which Plaintiff does not have an adequate remedy at law.   Plaintiff repeats and realleges the General Allegations against Harbor America and Vensure.

71.     By assuming the role and responsibilities of payroll service provider for PBEC, Harbor America was an agent of PBEC and assumed the role and responsibilities of PBEC to PBEC payroll payees to make accurate and timely payroll direct deposits to those payees.

72.     Harbor America, by acting as an agent of PBEC, had a duty to Dr. Allendorf, the person to whom the payroll was to be deposited, to actually, correctly and timely pay Dr. Allendorf the compensation while Harbor America discharged its role as payroll provider.

73.     Harbor America nevertheless made the Misdirected Payments into an account of someone other than Dr. Allendorf.

74.     Harbor America is thus responsible for its own negligence to Plaintiff in discharging their role and responsibilities as payroll service provider to Plaintiff.

75.     Pursuant to the Agreement, and sections 1.0, 3.2 and 5.2 thereof, Harbor America knew and agreed that it had the potential for liability to such third parties as Plaintiff for material breaches of the Agreement.

76.     When acting in the scope of their role as agent and payroll service administrator for PBEC, Harbor America negligently discharged those duties by: (i) failing to directly deposit the amount of the Misdirected Payments into Dr. Allendorf's bank account; (ii) failing to failing to have in

place proper safeguards in place to such as dialogue boxes confirming changes to account affiliation, (iii) failing to have anomaly identification to identify such anomalies such as two payees being paid into the same numbered bank account without cross-reference to the name on the bank account, (iv) failing to issue an exceptions report or similar type report when changes to bank account data occurs; and (v) after having been notified, and admitting, the Prior Misdirected Payments to others by Harbor America, failing to undertake proper and effective corrective action, and by failing to institute the proper safeguards to prevent the subsequent Misdirected Payments.

77.     As a result of those breaches of duty by Defendants to Dr. Allendorf, Dr. Allendorf has been damaged by at least $214,291.05.

WHEREFORE, Plaintiff Dr. Sarah L. Allendorf demands judgment against Defendant Harbor America East, Inc. and Harbor America Coastal, Inc. and Vensure Employer Services, Inc. for actual, consequential and incidental damages, and for such other relief as the Court finds just and proper.

## Count V

## Negligent Misrepresentation

78.     This count is brought in the alternative, based on torts independent to any contract, for which Plaintiff does not have an adequate remedy at law.   Plaintiff repeats and realleges the General Allegations against Harbor America and Vensure.

79.     By assuming the role of payroll service provider for PBEC, Harbor America were agents of PBEC.

80.     Harbor America, by acting as an agents of PBEC, had a duty to Dr. Allendorf, the person to whom the payroll was to be deposited, to actually, correctly and timely pay Dr. Allendorf the compensation while Harbor America discharged its role as payroll provider.

81.     Harbor America nevertheless made the Misdirected Payments into an account of someone other than Dr. Allendorf, yet reported that it had made those payments into can account owned by Dr. Allendorf.

82.     Harbor America is thus responsible for their own negligence to Plaintiff in discharging its role as payroll service provider and as agent of PBEC.

83.     Pursuant to the Agreement, and sections 1.0, 3.2 and 5.2 thereof, Harbor America knew and agreed that they had the potential for liability to such third parties as Plaintiff for material breaches of the Agreement.

84.     When acting in the scope of their role as agent and payroll service administrator for PBEC, Harbor America negligently discharged those duties by erroneously reporting to Dr. Allendorf that Harbor America had paid Dr. Allendorf the compensation Dr. Allendorf had earned from PBEC, when in fact Harbor America misdirected that compensation.

85.     The reports from Harbor America that Dr. Allendorf had been fully and correctly paid were in fact erroneous.

86.     At the time Harbor America made those reports, Harbor America intended Dr. Allendorf would rely upon those statements; however Harbor America knew or had reason to know, that such statements were erroneous when made.

87.     Harbor America further failed to confirm those statements to Dr. Allendorf were accurate once the aforesaid Prior Misdirected Payments were brought to the attention of Harbor America.

88.     As a result of those negligent misrepresentations by Harbor America to Dr. Allendorf , Dr. Allendorf was damaged by more than $ 416,000, and presently is damaged by at least $214,291.05.

WHEREFORE, Plaintiff Dr. Sarah L. Allendorf demands judgment against Defendant Harbor America East, Inc., Harbor America Coastal, Inc. and Vensure Employer Services, Inc. for consequential and incidental damages, and for such other relief as the Court finds just and proper.

## Count VI

### Equitable Accounting

89.    Plaintiff repeats and realleges the General Allegations against Harbor America and Vensure.

90.    Plaintiff was due compensation to be paid through the payroll services of Defendant, and Defendant was discharging those services for the benefit of Plaintiff.

91.    Defendant failed to pay that compensation, and claims further that the compensation was paid Plaintiff.

92.    Defendant maintains certain business accounting records which will show exactly how much and where the Misdirected Payments were made.

93.    Harbor America contractually assumed the role and responsibilities to maintain accurate records of payroll Payees of PBEC.

94.    Plaintiff is not in possession of those same records and/or those records are not or were not accurate at the time of the Misdirected Payments.

95.    In such circumstances, Plaintiff is entitled to a complete accounting of the amount of the Misdirected Payments, the target account(s) to which the Misdirected Payments were made, and an accounting of any amendments to said records.

WHEREFORE, Plaintiff demands judgment against Defendants for a complete accounting of the amount of the Misdirected Payments, the target account(s) to which the Misdirected Payments were made, and an accounting of any amendments to said records.

## Count VII

## Vicarious Liability

96.      Plaintiff repeats and realleges the General Allegations against Defendant Vensure.

97.      In or about 2018, Vensure merged with HAPS and thus acquired the HAPS subsidiaries, Defendants Harbor America East, Inc. and Harbor America Coastal, Inc.

98.      Pursuant to that merger, and based upon the acknowledgements and control by Vensure set forth below, Harbor America became an agent of Vensure, and through the Agreement or oral contract, Vensure contractually assumed the obligations, responsibilities and risks of PBEC with respect to timely and accurate compensation payment to Plaintiff and other PBEC payroll payees.

99.      During all times relevant hereto, both Harbor America Defendants were the agents of Vensure, contracting with parties, for the benefit and with the knowledge of Vensure.   Herein, the relevant Agreement or oral contract commenced in 2020, two years after the merger and acquisition of the Harbor America Defendants by Vensure.

100.     During all times relevant hereto, Vensure knew and allowed one or more of the Harbor America Defendants to process the PBEC payroll.

101.     The Prior Misdirected Payments and the Misdirected Payments were made by the Harbor America subsidiaries of Vensure, with the knowledge, consent, at the direction of Vensure, which then profited from those services provided by the Harbor America Defendants.   By these acts and omissions, Vensure thus directly participated in the complained-of conduct herein, the misdirecting of Plaintiff's compensation to another via the making of the Misdirected Payments.

102.     Further, Vensure took corrective action with respect to the Prior Misdirected Payments, but failed to change its payment system and processes to avoid a repetition of such mistakes, thus

acknowledging that the responsibility for accurate and timely payment of PBEC payroll was a risk and responsibility of Vensure.

103.    Further, by utilizing its subsidiaries to make the Misdirected Payments which Harbor America had contracted to make but accurately, Vensure acknowledged that that Harbor America was acting only as an agent for Vensure under either the Agreement or under the oral contract.

104.    During all times relevant hereto, Harbor America accepted that Vensure was fulfilling the payroll obligations of Harbor America. For example, the previous electronic payroll deposits, acknowledgments, and the Misdirected Payments, have all been made by Vensure through its "VFCCIENT" payroll system, which is part of the "VensureHR" internal operating division of Vensure.

105.    Thus, since the 2018 merger, Vensure controlled the contractual relationship with PBEC and decisions and communications with PBEC were made only with agents of Vensure through its VFCCIENT payroll system, using the VensureHR division of Vensure.

106.    Thus, during all times relevant hereto, Vensure thus controlled and dominated the actions of Harbor America with respect to the performance of the Agreement or the oral contract, such that Harbor America had no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation with respect to the Agreement or oral contract.

107.    Further, Vensure had and has the obligation to provide Plaintiff the accounting owed to Plaintiff by Harbor America, addressing the nature, frequency and destination of the Misdirected Payments.

108.    Vensure is thus vicariously liable to Plaintiff under Counts I through VI for the aforesaid breaches, acts, omissions and damages of Harbor America.

WHEREFORE, Plaintiff Dr. Sarah L. Allendorf demands judgment against Defendant Vensure Employment Services, Inc. for actual, consequential and incidental damages, and for such other relief as the Court finds just and proper.

### **Jury Demand**

Plaintiff hereby requests trial by jury on all matters so triable as of right.

Respectfully submitted,

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*

Avery S. Chapman, Esq.
FL Bar No. 517321
12008 South Shore Blvd.
Suite 105
Wellington, Florida 33414
Tel. 561.753.5996
Fax 561.828-2852
asc@chapmanlawgroup.net
teh@chapmanlawgroup.net

*Attorneys for Plaintiff*

# EXHIBIT 1

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

# CLIENT SERVICES AGREEMENT –
# PAYROLL ADMINISTRATIVE SERVICES OUTSOURCING

In consideration of the mutual covenants and agreements contained herein, and the following Client Service Agreement (collectively, the "*Agreement*"), the undersigned payroll administrative service provider(s), with its principal place of business located at 2600 W. Geronimo Place, Suite 100, Chandler, Arizona 85224 (designated hereafter as "*ASO Provider*") and Palm Beach Equine Clinic, Llc, a/an LLC entity ("*Client*"), whose address is 13125 Southfields Road , Wellington, FL 33414, agree to the following terms and conditions.

| | |
|---|---|
| 1.0 | **RECITALS.** |
| | ASO Provider engages in the employer support services business, a practice of outsourcing the administration of specified payroll and related tax matters. Such services by ASO Provider include acting as an agent for the Client for certain employee payroll-related administrative duties as set forth herein. The Client remains the employer of all employees for all purposes, and thereby takes sole responsibility for qualifying, supervising, hiring and firing all employees, as well as complying with applicable payroll, benefit and labor and employment laws and regulations. ASO Provider assists in the administration of payroll processing matters, but only as an off-site payroll outsourcing service. ASO Provider does not make an offer of hire for personnel under the supervision of Client, nor is ASO Provider an expressed or implied party to any collective bargaining agreement related to Client's employees. |
| 2.0 | **TERMS OF AGREEMENT.** |
| | ASO Provider agrees to begin providing services pursuant to this Agreement on or after a payroll ending cycle. Unless sooner terminated as provided herein, this Agreement shall continue until a thirty (30) day written notice of termination has been received by either Client or ASO Provider terminating the Agreement. |

| | | |
|---|---|---|
| | 2.1 | **IMMEDIATE TERMINATION.** |
| | | ASO Provider may terminate this Agreement immediately without prior written notice, upon the occurrence of one or more of the following events as determined by ASO Provider in its sole discretion: |

        i.    Failure to pay any invoice when due; In the event that Client is in default of this agreement due to its failure to pay invoice and/or all amounts due ASO Provider, ASO Provider, at its election reserves the right terminate this agreement retroactive to the beginning of Client's pay cycle for which Client is in default. Termination of the Agreement shall not relieve Client of any and all obligations set forth in this Agreement;

        ii.   Making a direct payment of taxable wages to any employee covered by this Agreement without consent of ASO Provider;

        iii.  The threat of or actual filing by or against Client for bankruptcy, reorganization or appointment of a receiver, supervisor, assignee, or liquidator over its assets or property;

        iv.  A money judgment against Client which remains unsatisfied for more than thirty (30) days and has not been appealed; and/or

        v.   ASO Provider determines, in its sole discretion that Client is a credit risk.

| | |
|---|---|
| 3.0 | **DUTIES AND RESPONSIBILITIES OF ASO PROVIDER.** |
| | ASO Provider agrees to provide payroll services to the Client subject to the terms and conditions of this Agreement. Specifically, ASO Provider shall perform the services outlined in this Section 3. |

| | | |
|---|---|---|
| | 3.1 | **COMPLIANCE WITH THE LAW.** |
| | | ASO Provider shall perform its obligations under this Agreement in compliance with all federal and state laws and regulations governing administrative service organizations. |
| | 3.2 | **PAYROLL ADMINISTRATION.** |
| | | ASO Provider shall process payroll payments in accordance with the applicable laws and regulations based upon timely and accurately reported payroll data provided by Client and will generate checks drawn upon the payroll bank account of ASO Provider. Client shall appoint ASO Provider as the Reporting Agent with authority to sign and file employment tax returns and make tax deposits for the Client to the federal, state and local jurisdictions. Client agrees to timely remit payment for the payment of employer payroll, payroll taxes, workers' compensation and ASO Provider service fees as described in Section 6.2 INTEREST ON PAYMENTS IN DEFAULT. |
| | 3.3 | **PAYROLL TAXES.** |
| | | ASO Provider shall withhold, remit, and report all required federal, state and local taxes using Client's payroll funds for which Client shall be invoiced. ASO Provider shall prepare and submit tax reporting forms required by law or regulation with respect to such compensation and benefits, including but not limited to Forms W-2 (Wage and Tax Statement) and comparable and/or counterpart forms prescribed by any state or local government. |
| | 3.4 | **RECORDKEEPING.** |
| | | The Client agrees to timely obtain and verify employment forms for new hires. Within twenty-four (24) hours of hiring a new employee, a copy of the ASO Provider ASO enrollment forms for the new employee shall be sent to ASO Provider for entry into ASO Provider's payroll system. ASO Provider shall provide the Client with the payroll register and other reasonable summaries as requested by Client. While certain payroll records may be maintained by ASO Provider, they remain the property of the Client and will be returned to the Client upon written request and termination of this Agreement. |

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

**4.0   DUTIES AND RESPONSIBILITIES OF THE CLIENT.**

Client understands that the employees are providing their services to the Client and that there is not a shared or joint employment relationship established between ASO Provider and the employees.

**4.1   EMPLOYMENT LAW COMPLIANCE.**

Client shall remain solely responsible for complying with federal, state and local laws governing labor and employment, including but not limited to the Civil Rights Acts of 1866, 1964 (including Title VII), and 1991; the Age Discrimination in Employment Act; the Americans with Disabilities Act ("ADA"); the Family and Medical Leave Act ("FMLA"); the Fair Labor Standards Act ("FLSA"); the Worker Adjustment and Retraining Notification Act ("WARN"); the National Labor Relations Act ("NLRA") the Equal Pay Act; the Vietnam Era Veteran's Readjustment Assistance Act; the Fair Credit Reporting Act ("FCRA"); the Employee Polygraph Protection Act; the Immigration Reform and Control Act ("IRCA"); the Older Workers Benefits Protection Act ("OWBPA"); the Occupational Health and Safety Act ("OSHA"); the Uniformed Services Employment and Reemployment Rights Act ("USERRA"); the California Labor Code, Government Code, and Wage Orders; and all other local, State (including any and all states within the United States) and Federal laws governing the employment relationship, including but not limited to, such laws governing discrimination in the workplace (collectively, the "State and Federal Employment Laws").

**4.2   PAYROLL PREPARATION.**

Client shall timely and accurately provide the data necessary for ASO Provider to process payroll, using the forms provided by ASO Provider, including but not limited to hours worked, rates of pay, and exempt / non-exempt status. Client shall maintain records of actual time worked by employees. To ensure accurate calculation of fees and proper withholding and reporting of taxes, Client agrees not to pay any wages or salaries directly to any employee without informing ASO Provider in writing of such payment and obtaining ASO Provider's written consent to do so. ASO Provider shall process payroll and draw checks on ASO Provider's payroll bank account. Client agrees to pay the submitted invoice promptly which covers the payroll and other payroll factors related to the employee's checks. If there are any errors in the payroll the Client agrees to communicate these errors to ASO Provider within twenty four (24) hours of the last payroll issued. Client agrees to be the ultimate depository of payroll records for insurance and government purposes, as required by law.

**4.3   PAYROLL TAX AND WORKERS' COMPENSATION PREPARATION.**

Client shall timely and accurately provide the data necessary for ASO Provider to process and submit all related federal, state, local taxes and workers' compensation deposits on behalf of Client. Data will include, but not be limited to any federal, state or local tax or workers' compensation notice, payment requirement, payment coupon or change in method or timing of payment, due date, penalty, discrepancy, credit or adjustment of any kind.

**4.4   CLIENT SPONSORED EMPLOYEE BENEFITS.**

Client shall provide all necessary and required notices to employees eligible for participation in the employee benefit programs sponsored by the Client. Client shall provide ASO Provider with all Client benefit plan information necessary for ASO Provider to accurately perform its payroll related functions that may affect employees covered by this Agreement, including, but not limited to the processing of any employee related payroll deductions. ASO Provider will assist Client as requested by producing payroll information which may be required for plan compliance purposes which remain the sole responsibility of the Client.

**4.5   HUMAN RESOURCE AFFAIRS AND COMMUNICATION.**

Client is solely responsible for all human resources related decisions and actions. Client is solely responsible for employee warning notices, compensation reviews, notices of change of employment status, employee exit interviews, and similar personnel matters. Liability for wrongful termination, employment discrimination, sexual harassment, and other labor and employment related matters, remains solely with the Client as the final and ultimate authority for managing the workforce of the Client. PEO may freely communicate with the Client's employees through text message or other mediums of communication in an effort to provide the employees with ancillary services unless the employee chooses to opt-out of receiving the communications.

**4.6   EMPLOYEE SAFETY AND WORKERS' COMPENSATION.**

Client agrees to comply with applicable federal, state and local laws related to employee safety and accident prevention in the workplace. This includes, but is not limited to compliance with the Occupational Safety and Health Act (OSHA). The Client remains responsible for the creation, posting and accuracy of the OSHA 300 logs and for all injuries at the workplace unless otherwise specified in this Agreement. Client agrees to maintain proper and required coverage for workers' compensation insurance as required by law for all workers covered by this Agreement. ASO Provider is not a workers' compensation carrier, ASO Provider does not provide workers' compensation insurance under this Agreement, and any insurance purchased by Client shall be in the Client's name.

**4.7   BUSINESS OPERATIONS.**

Client shall remain solely responsible for overseeing all aspects of the operation of Client's business, including, but not limited to the production and delivery of services and products, product design, accounting, cash control, and loss/breakage/theft prevention.

**4.8   DOWNSIZING NOTICES.**

Client shall remain solely responsible for providing all notices required by the WARN Act and similar federal, state or local laws.

**4.9   EMPLOYEE SUPERVISION.**

Client shall remain solely responsible for sufficiently supervising, directing, and controlling employees in order for Client to safely and lawfully conduct its business.

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

**4.10    GOVERNMENT CONTRACTS.**
Client shall remain solely responsible for complying with requirements pertaining to government contracts pursuant to federal, state, or local laws, regulations, and ordinances, including but not limited to compliance with Executive Order 11246, the Walsh-Healey Public Contracts Act, the Davis Bacon Act, and the Service Contract Act of 1965.

**4.11    NON-EMPLOYMENT LEGAL COMPLIANCE.**
Client shall remain responsible for complying with all laws governing the Client's business, including but not limited to required filings, licensing, taxes, fidelity bonding, insurance, facilities/building codes and regulations, and environmental compliance.

**5.0    INDEMNIFICATION.**

**5.1    CLIENT.**
Client hereby agrees to indemnify and hold ASO Provider harmless from and against any and all claims, demands, damages (including liquidated, punitive and compensatory), injuries, deaths, actions and causes of action, costs and expenses (including attorney's fees and expenses at all levels of proceedings), losses and liabilities of whatever nature (including liability to third parties), and all other consequences of any sort, whether known or unknown, without limit and without regard to the cause or causes thereof, arising from: the products or services provided by Client, the actions or in-actions of any employee of Client, or of any other individual, including without limitation, any claims asserting a violation of any federal, state and/or local law, regulation, ordinance, directive or rule whatsoever, and the State and Federal Employment Laws.

**5.2    ASO PROVIDER.**
ASO Provider hereby agrees to indemnify and hold Client harmless from any and all claims, demands, damages (including liquidated, punitive and compensatory), injuries, deaths, actions and causes of actions, costs and expenses (including attorney's fees and expenses at all levels of proceedings), losses and liabilities arising from ASO Provider's material breach of this Agreement.

**6.0    ASO FEE.**
Client shall pay ASO Provider an ASO Fee, which shall be an amount, for each pay period ("Pay Period") according to the rates set forth in the Fee Schedule, attached hereto as Schedule A and such fees and other amounts accruing and due from Client to ASO shall be personally guaranteed through the execution of Schedule D. Should Client require additional services not included in this Agreement, the fee for any such additional services shall be negotiated and paid separately. Client agrees that the fees outlined on Schedule A are not inclusive of other fees that may be assessed by ASO for failure to comply with the terms of this Agreement, including but not limited to the ancillary fees located on Schedule C.

**6.1    ASO FEE ADJUSTMENT.**
The ASO Fee Multipliers are based on conditions as of the Effective Date.  Additional ASO Fee Multipliers shall be determined from time to time as necessary to accommodate changes in job classifications of employees for workers' compensation purposes.  In the event of a change in Client's business, or in current taxes, laws, or regulations related to the Client/employee relationship which affects ASO Provider's costs, the ASO Fee Multipliers shall be adjusted for any change in such costs. In the event any such changes are not reported to ASO Provider prior to calculation of the ASO Fee for any Pay Period, the ASO Fee for such Pay Period shall be subject to retroactive adjustment and ASO Provider shall be entitled to payment of any such adjusted ASO Fee. Annually on agreement Effective Date, ASO Provider's ASO Fee Multiplier is subject to an automatic minimum adjustment of three percent of the administrative fee component of the ASO Fee Multiplier.

**6.2    INTEREST ON PAYMENTS IN DEFAULT.**
If Client fails to pay the ASO Fee for any Pay Period, or any other amount payable by Client to ASO Provider under this Agreement, on or before fifteen (15) days following the applicable due date, ASO Provider may, at its option, collect interest on the past due amounts and/or terminate this Agreement. Any such interest shall be in addition to any Late Payment Fee. The rate of interest on such past due amounts shall be a rate equal to the greater of the maximum amount allowed by law, eighteen percent (18%) per annum, or five percent (5%) in excess of the prime rate of interest, as published by the Wall Street Journal. Client shall pay any accrued interest within ten (10) days following demand for payment. The imposition of interest on late payments shall not extend the due date of any such payment, nor shall imposition of interest delay or impede ASO Provider's termination of this Agreement, or the pursuit of other remedies, for non-payment. The Late Payment Fee is calculated as 3% of the total ASO Fee, as defined in Section 6.0, and becomes due upon any failed transfer of funds, regardless of payment method, so long as the failure is not a direct result of an ASO Provider error or omission. ASO Provider requires the ASO Fee to be paid two (2) business days before delivery of payroll. ASO Provider furthermore requires all funds to be wire transferred directly into ASO Provider's account administered by Mission Bank. Wire transfers are Client initiated and ASO Provider will provide all necessary bank account information during the Client intake process, prior to the processing of Client's first payroll under this Agreement. ASO Provider does not accept checks as payment for services of any kind with the exception of the Initial Subscriber Account Set-up Fee as noted in Section 6.4 SERVICE PRICING.

**6.3    PAYMENT PROCEDURES.**
ASO Provider shall make payment on each Payday. The Payday shall be the same day of each Pay Cycle as the First Payday. Any change in the Payday shall require ASO Provider's prior consent one pay cycle prior to such change. ASO Provider may, if ASO Provider determines in its sole discretion that Client is a credit risk, require Client to tender payment for the charges for each employee, on the first business day prior to each payroll period in an amount equal to the estimated amount for the current payroll period. The estimated amount for the current payroll period will be the amount equal to the amount invoiced to and paid by the Client for the immediately preceding payroll unless ASO Provider, in its sole discretion, contacts the Client with a different amount. ASO Provider shall earn the amount concurrently with the accrual of the services ASO

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

Provider provides to Client. Upon receiving an invoice from ASO Provider, Client shall immediately pay for any additional amount for that payroll period. Any overpayment can be used by the Client to offset the estimated amount due on the subsequent payroll period. If the Client does not make the payment on the first business day prior to each payroll period as required by this paragraph, ASO Provider may, at its option, declare the Client to be in default and immediately terminate this Agreement.

**7.0   GOVERNMENT PROVISIONS OF THE AGREEMENT.**

**7.1   AMENDMENTS.**
This Agreement can be amended or modified only by written agreement between the parties.

**7.2   ARBITRATION AND SMALL CLAIMS.**
Except for claims for non-payment of fees under this Agreement and claims for injunctive relief, in the event of any claim, dispute or controversy arising out of or relating to the interpretation, performance and/or breach of this Agreement, the parties agree that any claim, dispute and/or controversy which would otherwise require or allow resort to any court or other governmental dispute resolution forum between Client and ASO, whether based on tort, contract, statutory or equitable law, or otherwise, shall be submitted to and determined exclusively by binding arbitration. The arbitration proceedings shall occur in Maricopa County, Arizona. The Arizona Code of Civil Procedure and Evidence shall apply to any such proceeding, and the arbitrator shall be a retired Federal or Arizona Superior Court Judge. To the extent applicable in Arizona civil actions, the following shall apply and be observed: all rules of pleading (including the right to file a demurrer and motion to strike), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, summary adjudication, and judgment on the pleadings. Resolution of the dispute shall be based solely upon the law governing the claims and defenses pled, and the arbitrator may not invoke any basis other than such controlling law. Awards exceeding Fifty Thousand Dollars ($50,000.00) shall include the arbitrator's written opinion providing reasoned explanations for the decision, and at either party's written request within ten (10) days after issuance of the award, shall be subject to reversal and remand, modification, or reduction following review of the record and arguments of the parties by a second arbitrator who shall, as far as practicable, proceed according to the law and procedures applicable to appellate review by the Arizona courts of appeal regarding a civil judgment following court trial.. Any claim, controversy, or dispute arising out of or related to this Agreement in an amount equal to or less than the jurisdictional limits applicable under the Small Claims Division of Justice Courts (A.R.S. § 22-501 et seq.) of the State of Arizona (the "Small Claims Division") shall be brought in Maricopa County, Arizona and shall be subject to, for purposes of this provision, the Small Claims Division. Client waives any objection to jurisdiction of the courts of the State of Arizona and venue in Maricopa County, Arizona.

**7.3   ASSIGNABILITY.**
This Agreement shall not be assigned by Client to another party without the written consent of ASO Provider, which consent shall not be unreasonably withheld. ASO Provider may assign this Agreement without any consent or notice to Client.

**7.4   ATTORNEY FEES.**
In the event of any proceeding to enforce the provisions of this Agreement, the prevailing party shall be entitled to an award of its costs and reasonable attorney's fees incurred at all levels of proceedings.

**7.5   AUTHORITY TO SIGN AGREEMENT.**
Any individual signing this Agreement on behalf of Client represents, warrants and guarantees that she or he has full authority to do so. Each party represents that it has the power and actual authority to enter into this Agreement and to be bound by the conditions and terms contained therein.

**7.6   BUSINESS INTERRUPTION.**
Neither party shall be liable to the other for any loss of business or any other damage, including but not limited to profits, good will, special, incidental or consequential damage, which results from performance of each party's obligations hereunder.

**7.7   CONSTRUCTION.**
ASO Provider has prepared this Agreement and provided it to Client for Client's review. Client has either retained counsel or had the opportunity to do so to review this Agreement. With respect to any dispute concerning the meaning of this Agreement, this Agreement shall be interpreted as a whole with reference to its relevant provisions and in accordance with its fair meaning, and no part of this Agreement shall be construed against ASO Provider on the basis that ASO Provider drafted it. This Agreement shall be viewed as if prepared jointly by ASO Provider and Client.

**7.8   COUNTERPARTS AND FAX SIGNATURES.**
This Agreement, any document or instrument entered into, given, or made pursuant to this Agreement or authorized hereby, and any amendment or supplement thereto may be executed in two or more counterparts, and, when so executed, will have the same force and effect as though all signatures appeared on a single document. Any Party may deliver its signature to this Agreement by facsimile and that signature shall be treated as an original for all purposes. Any signature page of this Agreement or of such an amendment, supplement, document, or instrument may be detached from any counterpart without impairing the legal effect of any signatures thereon, and may be attached to another counterpart identical in form thereto but having attached to it one or more additional signature pages.

**7.9   ENTIRE AGREEMENT.**
Any proposal, bid offer, or other prior discussion or communication regarding the subject matter of this Agreement is preliminary in nature, is superseded by this Agreement, and is intended solely for the purpose of discussion and evaluation. This Agreement constitutes the entire Agreement between the parties. No other agreement, statement or promise, or modification or amendment of the Agreement shall be binding unless in writing and signed by both parties to this Agreement. Client acknowledges that it has not been induced to enter into this Agreement by

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

any representation or warranty not set forth in this Agreement, including but not limited to any statement made by any marketing agent of ASO Provider. Client acknowledges that ASO Provider has made no representation concerning whether ASO Provider's services will improve the performance of Client's business.

**7.10   FALSE OR OMITTED INFORMATION.**
Any false statement or omission with regard to any information supplied by Client to ASO Provider in anticipation of Client's contracting with ASO Provider or at any other time shall be deemed a material breach of this Agreement and ASO Provider, at its option, may terminate this Agreement and seek appropriate relief.

**7.11   HEADINGS.**
Captions and organization are for convenience and shall not be used in construing meaning.

**7.12   INTEGRATION.**
This document, together with the Exhibit(s) attached hereto, constitutes the full, complete, absolute and entire agreement between the parties. There are no oral representations, arguments, or understanding affecting the same and any further such representations, agreements, understandings or waivers, in order to be binding upon the parties hereto, must be in writing and signed by the parties.

**7.13   NO PARTNERSHIP OR JOINT VENTURE.**
Nothing herein contained shall be deemed to create a joint venture or partnership between Client and ASO Provider.

**7.14   NO WAIVER OF RIGHTS.**
The waiver of performance of any covenant, condition or promise shall not invalidate this Agreement, nor shall it be considered a waiver of any other covenant, condition or promise. The exercise of any remedy provided in the Agreement shall not be a waiver of any consistent remedy provided by law, and the provisions in this Agreement for any remedy shall not exclude other consistent remedies unless they are expressly excluded.

**7.15   NOTICES.**
All notices and demands by mail shall be made by certified mail, postage prepaid, return receipt requested or by electronic mail. Notice shall be considered given and effective when mailed, or when transmitted, as applicable. Unless otherwise advised in writing by the other party, each party shall transmit notices and demands to the addresses indicated in the introductory paragraph of this Agreement or to any other such address or e-mail address provided to the other party in writing from time to time.

**7.16   RESPONSIBILITY FOR LEGAL RIGHTS.**
Client acknowledges and agrees that ASO Provider is not engaged in the practice of law or the provision of legal services, and that Client alone is completely and independently responsible for its own legal rights and obligations.

**7.17   SEVERABILITY.**
Should any term, warranty, covenant, condition or provision of this Agreement be held to be invalid or unenforceable by a court or other body of competent jurisdiction, the balance of this Agreement shall remain in force and shall stand as if the unenforceable part did not exist. The invalid or unenforceable provision shall be replaced by a provision as similar as possible and which is valid and enforceable.

**7.18   SUCCESSORS.**
The rights and obligations contained in this Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors.

**7.19   TERMS SURVIVING TERMINATION OF AGREEMENT.**
The obligation of either party to notify, indemnify, defend and hold harmless the other under the terms of this Agreement shall continue after the termination hereof with respect to events occurring prior to such termination.

FOR ASO(s): _____

FOR THE CLIENT: **Palm Beach Equine Clinic, Llc**

By: _____

By: _Shelley Rentas_
DocuSigned by:
D6D6469D402840A...

Print Name: _____

Print Name: SHELLEY RENTAS

Title: _____

Title: CFO

Date: _____

Date: 10/28/2020

**David Rhodes**
**Harbor America East**
(561) 336-2847
david.rhodes@hapeo.com

Last Modified...

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

## Schedule A

This addendum to the Client Services Agreement was created exclusively for Palm Beach Equine Clinic, Llc. The fees listed below are for all employer related services provided by the Company as outlined in the Client Services Agreement.

| State | Code | Code Description | # of Emps | Payroll Frequency |
|-------|------|------------------|-----------|-------------------|
| FL | 8831 | Hospital - Veterinary & Drivers | 40 | Bi-Weekly |

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

## Schedule A *(Cont.)*

### Administration

| | | |
|---|---|---|
| **Per Invoice/Check** | $50.00  $8.50 | *Per check, per employee based on payroll frequency. If $0.00, fees will be calculated based on the Administration percentage of payroll listed above.* |
| **Per Invoice Fee** | $50.00 | *Per invoice, per payroll frequency.* |
| **Client Implementation Fee** | $0.00 | *One-time Client set up fee.* |
| **Delivery Fee** | $25.00 | *Per location, per delivery of physical checks, reports, etc. (Does not pertain to Direct Deposit transactions or digital reporting.)* |

<u>Core Services Included:</u>

**Payroll Administration**
- Issue Payroll Checks/Direct Deposits
- Provide Unlimited Basic Reports
- Issue Annual W-2s
- Process Garnishments And Maintain Compliance
- Track PTO And Sick/Vacation Time
- Work Opportunity Tax Credit (WOTC)
- Basic General Ledger Interface
- Payroll Debit Card Access
- Service functionality to accommodate COVID-19 related programs such as PPP, CARES Act, FFCRA, etc

**Employees Enjoy Secure Access**
- Employment profile
- Printable check stubs
- Printable W-2s
- Earnings and deductions details
- Direct deposit information
- Tax withholdings elections and year-to-date totals
- Paid leave status and activity

**Vfficient Payroll Technology**
- Secure 24/7 Online Access to Payroll & Human Resource Data
- Customizable Security Settings by User
- Real-Time Updates to Payroll & Human Resource Data
- User Friendly Payroll Entry
- Online Payroll Approval Processing
- Manual Batch Creation Outside of Normal Payroll Processing
- Current & Historical Data Available for Insurance, 401k, PTO Benefits
- Access to Payroll, Human Resources, Census Reports, Invoices
- Employee Access to Personal Historical Payroll Information
- Memo Capabilities to Employees with Online Access

*See separate Fee Schedule to include, but not limited to, fees associated with ACH, NSF, Pre-Note Bypass, Envelope & Check Order, Customized Timesheet, Additional Batch, etc.*

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

# Schedule A *(Cont.)*

## Additional Services Available

| Service | Rate | Per | One-Time Implementation Fee | Request Further Information During Implementation for Possible Enrollment |
|---|---|---|---|---|
| 401(k) Administration *(Master Program)* | - | - | Included | |
| ACA Annual Reporting *(If Client Retained See Fee Schedule)* | - | - | Included | |
| Alternative Workforce Solution | | Varies by Position Required | | |
| Background Screening Services | | Varies by Product/Service Elected | | |
| Benefit Premium Remittance *(If Client Retained See Fee Schedule)* | | Varies by Product/Service Elected | | |
| Business Domain & Employee Identity Theft Protection | | Varies by Product/Service Elected | | |
| Custom Employee Self-Service Portal *(Client Logo Branding)* | $300 | One-Time | Included | |
| Direct Care Healthcare Services | | Varies by Product/Service/Coverage Tier Elected | | |
| Employee Perks | - | - | Included | |
| E-Verify | $3 | Verification | Included | |
| General Ledger Interface | | Basic Included, Customization Available | | |
| General Liability Pay-As-You-Go Insurance | | Varies by Product/Service Elected | | |
| HoRizon HR Client Development | | Varies by Product/Service Elected | | |
| Employee Personal Loans | - | - | Included | |
| Payroll Debit Cards | - | - | Included | |
| Payroll Funding & Business Loan Programs | - | - | Included | |
| Payroll Wages in Advance | - | - | Included | |
| Pet Insurance | | Varies by State & Pet | | |
| Recruiting Services | | Customized per Client & Position | | |
| Rental Car Discounts | - | - | Included | |
| Roadside Assistance | $4 | PEPM | Included | |
| Telehealth | $10 | PEPM | Included | |
| Telehealth - Behavioral Health Module | $3 | PEPM | Included | |
| TLM Solution - Swipeclock | $2 | | $300 | |
| TLM Solution - Swipeclock w/Prism | $3 | | $300 | |
| TLM Solution - Timeco w/Prism | $3 | | $300 | |
| Applicant Tracking System (Groups 1-100) | $150 | | $250 | |
| Applicant Tracking System (Groups 100-150) | $225 | | $375 | |
| Applicant Tracking System (Groups 151-200) | $300 | | $375 | |
| Applicant Tracking System (Groups 201-300) | $450 | | $438 | |
| Applicant Tracking System (Groups 301-400) | $550 | | $500 | |
| Applicant Tracking System (Groups 401-500) | $650 | | $563 | |
| Applicant Tracking System (Groups 501-600) | $750 | | $563 | |
| Applicant Tracking System (Groups 601-700) | $850 | | $625 | |
| Applicant Tracking System (Groups 701-800) | $950 | | $750 | |
| Applicant Tracking System (Groups 801-900) | $1,100 | | $875 | |
| Applicant Tracking System (Groups 901-1000) | $1,250 | | $1,000 | |
| Applicant Tracking System (Groups 1001-1400) | $1,500 | | $1,188 | |
| Applicant Tracking System (Groups 1401+) | Custom | | Custom | |
| Applicant Tracking System Text Service (Any Group Size) | $250 PCPY or $25 PCPM | | Included Above | |
| Performance Management Tool (Groups 1-100) * | $3 | | $750 | |
| Performance Management Tool (Groups 101-250) * | $3 | | $1,000 | |
| Performance Management Tool (Groups 251-500) * | $3 | | $1,500 | |
| Performance Management Tool (Groups 501+) * | Custom | | Custom | |

*\* Applicant Tracking System enrollment required to elect Performance Management Tool.*

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

# Schedule B

**WORKER'S COMPENSATION FEE DEFINITIONS** *(Not Applicable to PRO ASO.)*

*Master policy Workers' Compensation coverage is not available to Clients electing a Payroll Only ASO contract type. Please reach out to your Business Consultant for further information.*

1.  Total remuneration shall mean the sum of all payments to employees including non-taxable items such as reimbursements as well as the value of any non-cash compensation. Applies to the administrative fee.

2.  Gross taxable wages to limit shall mean the sum of all remuneration that is subject to federal and state taxes including diminution for pre-tax deductions, but not to exceed the annual limit as established by the applicable taxing authority. Applies to all taxes.

3.  Net work comp wages shall mean those wages subject to workers' compensation insurance premiums as defined by the National Council on Compensation Insurance ("NCCI") in accordance with their current state Basic Manual, excluding the excess portion of overtime wages; which are the portion of overtime earnings paid in excess of the regular earnings. For non-NCCI states, this term shall have the meaning assigned to them by that state's equivalent publication, excluding the excess portion of overtime wages; which are the portion of overtime earnings paid in excess of the regular earnings. Provided however, that any variations attributable to ASO's software system's limitations shall override.

4.  Each claim shall mean each incident for each individual where a workers' compensation claim is filed with ASO and/or the workers' compensation carrier through which coverage is provided under this Agreement.

DocuSign Envelope ID: 09D26947-7F07-49D4-ACB9-0DF1CB0C46F3

# Schedule C

## Additional Fee Schedule

| Service | Rate | Per |
|---|---|---|
| **PAYROLL** | | |
| ACH: Reversal | $40 | Per Reversal |
| ACH: Client NSF | $100 or 10%, Whichever is Greater | Per Occurrence |
| ACH: Same Day Processing | $1 | Per Employee |
| Stop Payment | $25 | Per Check |
| Pre-Note Bypass | $30 | Per Batch |
| Pre-Note Bypass: ACH Return | $30 | Per Return |
| Additional Batch Fee (Per Staffing Addendum) | $40 | Per Batch |
| Expedited Additional Check & Envelope Order | $50 + Shipping | Per Box |
| Custom Timesheet and/or New Hire Template Changes | $250 | Per Customization |
| Invalid SSN Changes/Adjustments (If amended tax needed.) | $25 | Per Adjustment |
| **UNEMPLOYMENT** | | |
| No Reply or Late Submission | $15 | Per Claim |
| **BENEFITS** | | |
| ACA Tracking Through Third Party Administrator (TPA) | $2 | PEPM |
| Year-End Reporting: ACA 1094/1095 Filing Through TPA | $3 | Per Document |
| **TAXES** | | |
| Fee Applied for Delinquent Tax Account Information Due by Filing Date | $100 | Per Delinquent Month |
| W-2c Adjustments | $25 | Per Adjustment |
| Amended Tax Return | $150 per Hour | Per Amendment |
| SUTA Import (If not received prior to 1st payroll.) | $250 | One-Time |
| **PTO** | | |
| Additional Policy Setup (In excess of 3.) | $100 | Per Policy |
| Policy Updates (Changes to policy after initial setup.) | $250 | Per Update |
| **OTHER** | | |
| Failure to Provide 30 Days Notice of Cancellation | $2,500 | One-Time |
| Client logo branding on Employee Portal | $300 | One-Time |

Signature for Schedules A, B, and C:

| COMPANY | CLIENT |
|---|---|
| By: _____ | By: *Shelley Rentas* (DocuSigned by) |
| Name: _____ | Name: SHELLEY RENTAS |
| Title: _____ | Title: CFO |
| Date: _____ | Date: 10/28/2020 |



## Certificate Of Completion

Envelope Id: 09D269477F0749D4ACB90DF1CB0C46F3
Subject: DocuSign Signature Required - Contract
Source Envelope:
Document Pages: 10                  Signatures: 2
Certificate Pages: 4                Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Envelope Originator:
VES DocuSign
2600 W Geronimo Place
Suite 100
Chandler, AZ  85224
tera.young@vensure.com
IP Address: 67.192.3.44

### Record Tracking

Status: Original
   10/28/2020 9:58:11 AM

Holder: VES DocuSign
   tera.young@vensure.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Shelley Rentas<br>Shelley.rentas@equineclinic.com<br>Security Level: Email, Account Authentication (None) | *Shelley Rentas*<br>Signature Adoption: Pre-selected Style<br>Using IP Address: 12.158.46.70 | Sent: 10/28/2020 9:58:13 AM<br>Viewed: 10/28/2020 9:59:49 AM<br>Signed: 10/28/2020 10:01:55 AM |

Electronic Record and Signature Disclosure:
  Accepted: 10/28/2020 9:59:49 AM
  ID: 69ca5ea2-71ed-44c0-a016-68a66c5390c9

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/28/2020 9:58:13 AM |
| Certified Delivered | Security Checked | 10/28/2020 9:59:49 AM |
| Signing Complete | Security Checked | 10/28/2020 10:01:55 AM |
| Completed | Security Checked | 10/28/2020 10:01:55 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 2/11/2020 9:55:22 AM
Parties agreed to: Shelley Rentas

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Vensure Employer Services (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Vensure Employer Services:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: AllClientRelations@Vensure.com

**To advise Vensure Employer Services of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at AllClientRelations@Vensure.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address other than the new address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Vensure Employer Services**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to AllClientRelations@Vensure.com and in the body of such request you must state your email address, full name, mailing address, and telephone number.

**To withdraw your consent with Vensure Employer Services**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to AllClientRelations@Vensure.com and in the body of such request you must state your email, full name, mailing address, and telephone number. Please provide the following information if you wish to withdraw consent: Name, Title, Phone, Email Address.  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Vensure Employer Services as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Vensure Employer Services during the course of your relationship with Vensure Employer Services.

# EXHIBIT 2



HOME    SERVICES    NEWS    EDUCATION    ABOUT US          Search  🔍 ⚙       Log In   Sign Up

## Harbor America Celebrates 25 Years In Business and Fourth Anniversary with Vensure Employer Services

February 23, 2022 04:53 PM Eastern Standard Time

KINGWOOD, Texas--(BUSINESS WIRE)--Harbor America, a nationally-recognized professional employer organization, celebrated 25 years in business since its founding and a fourth partnership anniversary with Vensure Employer Services, the nation's fastest-growing professional employer organization.

"As we serviced a majority of blue-collar industries, we saw an opportunity in gray and white-collar industries, but we needed the help to do so."

🐦 Tweet this

"We started Harbor America to develop a PEO that created trust with businesses and employees through an extension of professional services, enhanced benefit options, and exceptional customer service," said Harbor America CEO Doug Lowery. "As we serviced a majority of blue-collar industries, we saw an opportunity in gray and white-collar industries, but we needed the help to do so."

Doug Lowery began his professional career in trucking and logistics. Lowery served in executive management of major corporations, startup operations, and sales and marketing throughout his career. Placing a high value on the American worker, Harbor America was created to support day-to-day business operations by providing organizations with benefits, support, and services to foster better places to work. Lowery's vast range of business experience shaped him to be an innovative leader in the PEO industry, and in 1997, Lowery was named president of Harbor America.

Harbor America merged with Vensure Employer Services in 2018. The goal of the partnership was to bridge the gap between predominantly manual labor industry needs with the tools and services to support clerical, administrative, and managerial industries. Implementation of the tools and services extended from Vensure, Harbor America has evolved over the years to serve the gray and white-collar markets successfully.

"We are very pleased with our partnership with Vensure, which has allowed us to expand our services and opportunities to serve our clients with greater depth and care. We look forward to continued success, growth, and partnership with like-minded businesses and continue our dedicated employee-first approach that has solidified Harbor America as a leader in this industry," said Lowery.

To learn more about Vensure Employer Services, please contact press@vensure.com or visit https://www.vensure.com/.

**About Vensure Employer Services**

Vensure Employer Services, is a privately owned professional employer organization (PEO) headquartered in Chandler, Arizona. As the nation's fastest-growing PEO, with over 432,000 worksite employees, Vensure uses industry-leading technology to offer complete, end-to-end solutions for outsourced payroll, human resources, benefits, risk management, and workers' compensation services. Vensure is committed to helping thousands of clients manage, nurture, and grow their business by providing employee and employer-related administration services. To learn more, visit https://vensure.com/.

A subsidiary of Vensure Employer Services, Harbor America provides integrated services to effectively manage critical human resource responsibilities and employer risks for their clients. Harbor America delivers these services by establishing and maintaining a co-employer relationship with the employees at the client's work site and by contractually assuming certain employer rights, responsibilities, and risk.

## Contacts

Spencer Packer
press@vensure.com
Vensure Employer Services
2600 W. Geronimo Place, Suite 100
Chandler, AZ 85224
Office: 800.409.8958

---

**Vensure** Employer Services

**VENSURE EMPLOYER SERVICES**

**Release Summary**

The renown PEO service celebrates its 25th year in business and fourth partnership anniversary with sister provider Vensure Employer Services.

**Contacts**

Spencer Packer
press@vensure.com
Vensure Employer Services
2600 W. Geronimo Place, Suite 100
Chandler, AZ 85224
Office: 800.409.8958

# EXHIBIT 3



Home   PEO Services   Why Harbor America?   Agriculture/H-2A   Contact   GET A QUOTE

## What is a PEO?                                                                              —

A PEO provides integrated services to effectively manage critical human resource responsibilities and employer risks for clients. A PEO delivers these services by establishing and maintaining a co-employer relationship with the employees at the client's work site and by contractually assuming certain employer rights, responsibilities and risk. A PEO provides relief from the burden of employment administration.

A wide range of personnel management solutions through a team of professionals.

Improved employment practices, compliance and risk management to reduce liabilities.

Access to a comprehensive employee benefits package, allowing clients to be competitive in the labor market.

Assistance to improve productivity and profitability.

## Who uses Harbor America?                                                                    +

## How does a PEO arrangement work?                                                            —



Once a client company contracts with Harbor America, we then co-employ the client's worksite employees. In the arrangement, a worksite employee and a client company enter into a co-employment relationship in which the client company and Harbor America have an employment relationship with the worker. We then share and allocate responsibilities and liabilities. The client company retains responsibility for and manages the day-to-day activities and supervision of the employee. Harbor America and you, the client, will share certain responsibilities for employment law compliance.

# EXHIBIT 4



## About

Harbor America provides integrated services to effectively manage critical human resource responsibilities and employer risks for their clients. We deliver these services by establishing and maintaining a co-employer relationship with the employees at the client's work site and by contractually assuming certain employer rights, responsibilities, and risk.